**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| JAMES TORLAI, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:14-CV-185 (JCH) |
| | : | |
| BRUCE J. LaCHANCE, | : | DECEMBER 15, 2015 |
| Defendant. | : | |
| | : | |

**BENCH TRIAL RULING**

## I.    INTRODUCTION

This is an action brought by plaintiff James Torlai ("Torlai") pursuant to section

1983 of title 42 of the United States Code ("section 1983") for violations of his rights

under the United States Constitution.  Torlai alleges that defendant Bruce LaChance

("LaChance"), a Connecticut State Trooper, violated his rights under the Fourth

Amendment to be free from false arrest and malicious prosecution.  Torlai sues

LaChance only in his individual capacity.  See Compl. at 1 ¶ 4 (Doc. No. 1).  LaChance

denies Torlai's allegations and asserts the defense of qualified immunity.

As explained in the following discussion, the court concludes that LaChance had

probable cause to arrest Torlai for operating a motor vehicle while under the influence of

drugs or alcohol.  Because LaChance had probable cause to arrest Torlai, Torlai's

section 1983 claim for false arrest fails.  See Jaegly v. Couch, 439 F.3d 149, 154 (2d

Cir. 2006).  The court also concludes that Torlai has failed to carry his burden of

establishing that all of the elements of malicious prosecution are met for the charges

against him, which means that Torlai's malicious prosecution claim also fails.  Because

Torlai's claims of false arrest and malicious prosecution fail, the court need not reach

1

the question of whether LaChance is entitled to qualified immunity for his actions.
Accordingly, the court orders that Judgment be entered in favor of LaChance on all
claims.

## II.    FINDINGS OF FACT[1]

On June 16, 2011, at approximately 3:00 PM, Torlai was driving a pickup truck
on Route 8 near Watertown, Connecticut.  LaChance was also driving on Route 8 in a
marked law enforcement vehicle.  LaChance noticed that Torlai's vehicle was driving
approximately 60 miles per hour in the left lane of a portion of the highway with a posted
speed limit of 65 miles per hour, thereby impeding the regular flow of traffic.  After
following Torlai for a short period of time, LaChance passed Torlai's vehicle in the right
lane and then merged back into the left lane in front of Torlai.  LaChance continued to
observe Torlai's vehicle in his rearview mirror.  While watching Torlai's vehicle,
LaChance saw the wheels of Torlai's truck twice cross the white dotted line that
demarcates the two lanes of traffic, at which point LaChance put on his lights and pulled
over the vehicle driven by Torlai.

After the vehicles were stopped, LaChance approached Torlai's window.  Torlai
rolled down the window a couple of inches so that he and LaChance could speak and
pass documents back and forth, but when LaChance asked him to roll the window down
further, Torlai refused.  LaChance noted that Torlai's eyes were glossy, bloodshot, and
that he had constricted pupils; LaChance also thought he detected a faint whiff of
alcohol emanating from Torlai's vehicle.  These facts suggested to LaChance that Torlai

---

[1] The court has sought to separate out its findings of fact from its conclusions of law.  However, there may be occasions when findings of fact are intertwined with the legal discussion in the Conclusions of Law section.

could be under the influence of an intoxicant.  LaChance asked Torlai a number of

questions, including whether he had been drinking and where he was coming from.

Torlai refused to answer any of LaChance's questions, but he did provide LaChance

with his driver's license and vehicle registration.  At some point during the conversation,

Torlai consumed nuts and drank a non-alcoholic beverage that he had in the front seat

of his truck.  LaChance thought these actions might be an attempt by Torlai to hide the

fact that he had been drinking alcohol.  In light of his suspicions, and the fact that Torlai

was not being fully cooperative, LaChance returned to his vehicle and radioed for

backup.  In a recording of the call LaChance made while in his vehicle, LaChance does

not sound upset or frustrated, but rather genuinely puzzled by Torlai's behavior.  Three

additional law enforcement officers arrived on the scene in response to LaChance's call

for assistance.

At some point after LaChance called for backup, he asked Torlai to get out of his

vehicle.  Torlai complied.  While Torlai was waiting, he walked over and sat down on a

barrier by the side of the road.  Both LaChance and another of the law enforcement

officers who arrived later thought that this behavior was further proof that Torlai could be

intoxicated, as it suggested that Torlai might be unable to maintain his balance.  Torlai

continued to refuse to answer questions, and he also told LaChance that he would not

undertake a field sobriety test.  LaChance placed Torlai under arrest for failure to

maintain his traffic lane, a violation of section 14-236 of the Connecticut General

Statutes ("C.G.S.A."), and for operating a motor vehicle while under the influence of

drugs or alcohol ("OUI"), a violation of section 14-227a of the C.G.S.A.  LaChance

transported Torlai to Troop L ("the troop") for processing.

Once at the troop, LaChance removed assorted articles from Torlai's person and made an inventory of Torlai's possessions. Torlai declined to sign the inventory. He did, however, cooperate in the performance of a breathalyzer test. When the reading on the breathalyzer device indicated that Torlai had not recently consumed any alcoholic beverages, LaChance asked Torlai for a urine sample, which Torlai provided. However, Torlai refused to sign a label on the urine sample to confirm that the sample was his. The urinalysis revealed that, although Torlai had diphenhydramine in his system from an over-the-counter sleep aid he had consumed the night before, he had no other drugs or alcohol in his system at the time of his arrest.

During the course of his processing and testing, Torlai continued to refuse to provide information about himself, including whether he required any medication or had any sort of medical condition, and he also refused to confirm that the information LaChance had collected about Torlai was accurate. In order to obtain this information, another law enforcement officer, Trooper Dick Murchison ("Murchison"), was dispatched to the address listed on Torlai's driver's license. While at that address, he spoke with Torlai's father and sister. Torlai's relatives stated that Torlai had not resided at that address for a number of years, but they confirmed that he had no known medical or psychological conditions.

At some point after Trooper Murchison's investigation, LaChance charged Torlai with three additional violations: failure to drive in the right lane, see C.G.S.A. § 14-230, failure to notify the Department of Motor Vehicles ("DMV") of a change in address, see C.G.S.A. § 14-17a, and interfering with an officer, see C.G.S.A. § 53a-167a. On the basis of the court's observations and the evidence presented at trial, the court finds that

LaChance added these charges because he genuinely believed that Torlai was guilty of the violations charged.  The court specifically finds that LaChance was not motivated by malice, bias, or some other improper purpose when he arrested and charged Torlai with these crimes and violations.  Based on the charges against Torlai, a troop supervisor, Sergeant John Covello, set bail for Torlai at $10,000 cash or surety.  Torlai was given the opportunity to make a phone call to speak to someone about his arrest or to try to secure bail, but he declined to do so.

Torlai was held overnight at the Connecticut Correctional Center in New Haven, Connecticut, and appeared in Superior Court in Waterbury, Connecticut the following morning.  At that hearing, the Connecticut Superior Court ordered Torlai released from custody on a promise to appear.  Following his arrest, a local newspaper ran a notice on Torlai's arrest in which the newspaper falsely reported that Torlai was a registered sex offender who had failed to notify the state of a change in his address.  The newspaper later published a correction, but the publication of this false information deeply affected Torlai.  Torlai also had to spend time defending himself against the charges, and over the course of seven months he appeared in state court approximately six times.  In January 2012, all of the charges against Torlai were dismissed.

On February 14, 2014, Torlai initiated this lawsuit, which seeks money damages for the alleged violations of his rights under the Fourth Amendment of the United States Constitution caused by LaChance's actions.  In particular, Torlai alleges that LaChance committed a false arrest and engaged in malicious prosecution when LaChance took Torlai into custody following the traffic stop on June 16, 2011.  The court held a bench trial on Torlai's claims on November 23, 2015.

III.     **CONCLUSIONS OF LAW**

A.     <u>False Arrest</u>

Torlai's section 1983 claim for false arrest "derives from his Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." <u>Jaegly v. Couch</u>, 439 F.3d 149, 151 (2d Cir. 2006). In analyzing section 1983 claims based on an allegation of false arrest, the court must "generally look[ ] to the law of the state in which the arrest occurred." <u>Davis v. Rodriguez</u>, 364 F.3d 424, 433 (2d Cir. 2004). Because the events giving rise to this lawsuit occurred in Connecticut, the court will generally look to Connecticut law.

Under Connecticut law, "[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." <u>Green v. Donroe</u>, 186 Conn. 265, 267 (1982). The burden of proving that an arrest was unlawful rests on the plaintiff. <u>See</u> <u>Beinhorn v. Saraceno</u>, 23 Conn. App. 487, 490-91 (1990); <u>see also</u> <u>Russo v. City of Bridgeport</u>, 479 F.3d 196, 203 (2d Cir. 2007) (noting that the burden is on the plaintiff to prove a false arrest under Connecticut law). In cases where the plaintiff was arrested without a warrant, Connecticut law "requires that the arresting officer have probable cause to effect a valid arrest." <u>Beinhorn</u>, 23 Conn. App. at 491. Thus, in order to prevail on a false arrest claim, Connecticut courts require the plaintiff to prove that the arresting officer lacked probable cause.[2] Put another way, "in Connecticut, a false

---

[2] The Second Circuit has noted that there is a circuit split on the question of who bears the burden of proof with respect to the existence of probable cause in section 1983 false arrest claims, and the Second Circuit itself has not squarely decided the question. <u>See</u> <u>Davis v. Rodriguez</u>, 364 F.3d 424, 433 n.8 (2d Cir. 2004); <u>see also</u> <u>Warheit v. City of New York</u>, 271 Fed. Appx. 123, 125 (2d Cir. 2008) ("We have not yet addressed the question of whether the [section] 1983 plaintiff has the burden of proving the absence of probable cause or whether the defendant has the burden of proving its existence.") However, the court need not engage further with this question because, even if the burden of establishing

arrest claim cannot lie when the challenged arrest was supported by probable cause."
Russo, 479 F.3d at 203 (citing Beinhorn, 23 Conn. App. at 491).

The probable cause requirement under Connecticut law is the same as the requirement under federal law.  See Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir. 2007).  "Probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested."  Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007).  The court must look to the "totality of the circumstances" to determine whether an arresting officer had probable cause to effect the arrest, Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002) (quoting Illinois v. Gates, 462 U.S. 213, 233 (1983)), and must use an objective standard in making this assessment, see Zellner, 494 F.3d at 369.  In sum, determining whether there is probable cause in a given case "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  Devenpeck v. Alford, 543 U.S. 146, 152 (2004).

The totality of the circumstances surrounding the encounter between LaChance and Torlai during the stop on Route 8 establish that LaChance had probable cause to arrest Torlai for driving while under the influence of alcohol or drugs.  Based on its observations at trial, the court finds LaChance to be highly credible.  He was calm and composed during his testimony, the answers he gave to the questions posed to him were consistent and coherent, and he gave no indication of being motivated by any kind

the existence of probable cause rested with LaChance, the court would find that LaChance carried that burden and that probable cause to arrest Torlai existed on at least one charge in this case.

7

of bias or malice.  Therefore, the court credits LaChance's testimony that he pulled

Torlai over because he observed the vehicle driven by Torlai twice cross the dotted

white line that separates two highway lanes, a violation of section 14-236 of the

Connecticut General Statutes.  See also Def.'s Ex. 501 at 3 (reporting that LaChance

observed Torlai driving erratically).  The court also credits LaChance's testimony that,

when he first spoke with Torlai, LaChance noticed that Torlai's eyes were bloodshot,

Torlai's pupils were constricted, and there was a faint odor of alcohol emanating from

Torlai's vehicle.[3]  A reasonable officer could have concluded, as LaChance did, that

these facts suggested Torlai was operating a motor vehicle while under the influence of

an intoxicant.

　　　The credibility of LaChance's testimony at trial is buttressed by the fact that both

the content of his testimony and his general demeanor were consistent with the

recording of the phone call he made in the middle of his interactions with Torlai.  See

Def.'s Ex. 502.  In that call, LaChance relays many of the facts to which he testified at

trial, and he sounds genuinely surprised and puzzled by Torlai's behavior (in particular,

Torlai's decision to consume nuts and some kind of liquid while LaChance was asking

him questions).  The court can discern nothing in the phone call that indicates

LaChance was acting arbitrarily or was motivated by some kind of vindictiveness or

malice at the time he decided to stop and ultimately arrest Torlai.  Rather, what

LaChance relays in the phone call is a reasonable concern, based on LaChance's

---

[3] Although the breathalyzer test and urinalysis performed on Torlai indicated that Torlai did not have alcohol in his system at the time of his arrest, the court can imagine any number of other reasons Torlai's vehicle could have smelled of alcohol at the time of the traffic stop.  Therefore, the fact that Torlai had not been drinking does not wholly discredit LaChance's testimony that Torlai's vehicle smelled faintly of alcohol, and that this smell was part of the reason LaChance suspected Torlai was operating a motor vehicle while under the influence of an intoxicant.

observations at the time of the traffic stop, that Torlai is under the influence of alcohol or drugs, and a desire to make sure that Torlai is fit to drive.

LaChance's report in the recorded phone call and testimony at trial is also corroborated by the testimony of other law enforcement officers who were involved in Torlai's detention and arrest.  In particular, Trooper Gregory Zordan ("Zordan") confirmed that once Torlai exited his vehicle, he sat down on some kind of concrete barrier or guardrail at the side of the road.  Both LaChance and Zordan testified that this suggested to them that Torlai might be under the influence of alcohol or drugs, as in their experience people who sit down or lean against something during a traffic stop may be having trouble maintaining their balance due to the effects of an intoxicant.

The court concludes that a law enforcement officer in LaChance's position, faced with the totality of these facts and circumstances, could reasonably believe that Torlai had been operating a motor vehicle while under the influence of alcohol or drugs in violation of section 14-227a of the Connecticut General Statutes.  See State v. Royce, 29 Conn. App. 512, 519 (1992) (holding that an officer had probable cause to arrest for violation of section 14-227a where officer "observed the glassy and red condition of the defendant's eyes, noted an odor of alcohol coming from the vehicle" and noted that the defendant had trouble with parts of field sobriety tests).  As a result, the court concludes that LaChance had probable cause to arrest Torlai.

Because the court concludes that LaChance had sufficient reason to stop the vehicle driven by Torlai (i.e., Torlai's failure to keep his vehicle within a single highway lane, as required by section 14-236 of the Connecticut General Statutes), as well as probable cause to arrest Torlai for violation of section 14-227a of the Connecticut

General Statutes, the court need not reach the question of whether LaChance had probable cause to arrest Torlai for any of the other crimes and violations with which Torlai was ultimately charged.  See Jaegly, 439 F.3d at 154 (noting that "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge").  Torlai's false arrest claim fails.

      B.    <u>Malicious Prosecution</u>[4]

    "In order to prevail on a [section] 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment . . . and must establish the elements of a malicious prosecution claim under state law." <u>Manganiello v. City of New York</u>, 612 F.3d 149, 160-61 (2d Cir. 2010) (citations omitted); <u>see also</u> <u>Conway v. Village of Mount Kisco, N.Y.</u>, 750 F.2d 205, 214 (2d Cir. 1984) (noting that "[b]ecause there are no federal rules of decision for adjudicating [section] 1983 actions that are based upon claims of malicious prosecution," the court is "required by 42 U.S.C. § 1988 to turn to state law . . . for such rules").  The events giving rise to this lawsuit occurred in Connecticut, LaChance is a Connecticut State Trooper, and Torlai is a resident of Connecticut.  Therefore, to succeed on his malicious prosecution claim, Torlai must establish both that LaChance's actions violated his rights under the Fourth Amendment of the United States Constitution, and that LaChance's

---

[4] Torlai's Complaint pleads his malicious prosecution claim as a violation of the United States Constitution and section 1983—not as a claim under state law.  <u>See</u> Compl. at 3 ¶ 13 (Doc. No. 1).  The Joint Trial Memorandum filed by the parties confirms that Torlai only alleges a federal malicious prosecution claim.  <u>See</u> Joint Trial Mem. at 10 ¶ 7 (Doc. No. 32).

actions satisfy the elements of malicious prosecution under Connecticut law.[5]

Connecticut law provides that the elements of malicious prosecution are:  "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice."  Brooks v. Sweeney, 299 Conn. 196, 210-11 (2010).  "If a plaintiff is unable to prove any element, his claim, necessarily, fails."  Karwowski v. Fardy, 118 Conn. App. 480, 487 (2009).

1.      Fourth Amendment Violation

For Torlai's malicious prosecution claim to be actionable under section 1983, Torlai must first establish that he was subject to some kind of seizure, as a federal malicious prosecution action is "grounded ultimately on the Fourth Amendment's prohibition of unreasonable seizures."  Swartz v. Insogna, 704 F.3d 105, 112 (2d Cir. 2013).  The Second Circuit has "consistently held that a post-arraignment defendant who is obligated to appear in court in connection with criminal charges whenever his attendance is required suffers a Fourth Amendment deprivation of liberty."  Id. (internal quotations, citation, and alterations omitted).

---

[5] Although the Second Circuit has clearly said that a successful federal malicious prosecution claim requires the plaintiff to establish both that his rights under the Fourth Amendment were violated and that his claim meets all the elements of a malicious prosecution claim under state law, see Willey v. Kirkpatrick, 801 F.3d 51, 70 (2d Cir. 2015), there is a Circuit split on the question of whether a plaintiff must establish the state law elements of malicious prosecution when the malicious prosecution claim is federal in nature, see Sykes v. Anderson, 625 F.3d 294, 309 (6th Cir. 2010).  In particular, some Circuits do not require "that a plaintiff demonstrate 'malice' in order to prevail on a Fourth Amendment claim for malicious prosecution."  Sykes, 625 F.3d at 309.  In this case, the outcome might have been different if Torlai did not have to establish the malice element of a malicious prosecution claim under Connecticut law to succeed on his malicious prosecution claim under federal law.  However, the court is bound by the Second Circuit's precedents, and therefore Torlai must establish all of the elements of a malicious prosecution claim under Connecticut law in order to prevail.

At trial in this case, Torlai testified that he was released from custody on a promise to appear after spending the night in jail.  Torlai further testified that he was required to appear in state court approximately six times over a seven month period before the criminal charges against him were dropped.  Torlai's testimony was not contradicted by LaChance, and the court found Torlai's testimony on these points credible.  The multiple appearances Torlai was required to make in state court in connection with the criminal charges instituted by LaChance constituted a seizure within the meaning of the Fourth Amendment.  Id.  Because Torlai has made out a potential violation of his rights under the Fourth Amendment, the court must turn to the question of whether Torlai has proven each element of a claim for malicious prosecution under Connecticut law.

### 2.      Connecticut Malicious Prosecution Elements

As noted above, there are four elements for a claim of malicious prosecution under Connecticut law.  Two of these elements—the first two—are clearly met in this case:  LaChance did not contest that it was his arrest report that led to the institution of criminal charges against Torlai, and the parties agree that all of the charges against Torlai were ultimately dismissed.  Thus, the court need only analyze the latter two elements of a Connecticut malicious prosecution claim, namely whether LaChance acted without probable cause and whether LaChance acted maliciously when he filed charges against Torlai.  The court will consider these latter two elements in turn.

### a.      Probable Cause

The probable cause inquiry in the context of a malicious prosecution claim is distinct from the probable cause inquiry relevant to an assessment of a false arrest

claim.  See D'Angelo v. Kirschner, 288 Fed. Appx. 724, 726 (2d Cir. 2008) (noting that "it is error to conflate probable cause to arrest with probable cause to believe that [someone] could be successfully prosecuted" (internal quotations and citation omitted)). The two probable cause inquiries may be related, however, because "[o]rdinarily, in the absence of exculpatory facts which became known after an arrest, probable cause to arrest is a complete defense to a claim of malicious prosecution."  Id.; see also Shea v. Berry, 93 Conn. 475, 477 (1919) (noting that probable cause is a complete defense to malicious prosecution).  But "probable cause to arrest as to one charge does not necessarily defeat a claim of malicious prosecution as to other criminal charges that were resolved in the plaintiff's favor."  D'Angelo, 288 Fed. Appx. at 726-27.  For the other charges, the court must undertake a separate probable cause inquiry.

Connecticut courts have explained that probable cause in the context of a malicious prosecution claim is "the knowledge of facts sufficient to justify a reasonable person in the belief that there are reasonable grounds for prosecuting an action."  Falls Church Group, Ltd. v. Tyler, Cooper and Alcorn, LLP, 281 Conn. 84, 94 (2007). Connecticut courts have also made clear that the probable cause element of a malicious prosecution claim is related to the malice element, and "[m]alice may be inferred from lack of probable cause."  Id.  The reverse is not true, however—probable cause "cannot be inferred from the fact that malice was proven."  Id.

After his arrest, Torlai was charged with five violations of Connecticut state law: operating a motor vehicle while under the influence of alcohol or drugs; failure to drive right; failure to maintain his lane; failure to notify the DMV of a change in his address within 48 hours; and interfering with an officer.  The court has already determined that

LaChance had probable cause to arrest Torlai on the first of these charges (operating a vehicle while under the influence of alcohol or drugs), and the court now concludes that LaChance's probable cause to arrest Torlai for OUI is a "complete defense to a claim of malicious prosecution" on that same charge.[6] D'Angelo, 288 Fed. Appx. at 726.

The court also concludes that there was clear probable cause to support the charges against Torlai for failure to drive right, failure to maintain his lane, and failure to notify the DMV of a change in address within 48 hours.  LaChance testified that he observed Torlai driving 60 miles per hour in the left lane of the highway for an extended period of time and that he watched the vehicle driven by Torlai twice cross the white dotted line that demarcates two lanes of traffic.  The court credits this testimony, and thus concludes that a reasonable officer could believe, as LaChance did, that these observations constituted grounds to charge Torlai with failure to drive right and failure to maintain his lane.  Similarly, Murchison testified that after Torlai's arrest, he was dispatched to the address listed on Torlai's driver's license to determine whether Torlai resided at that address and whether he had any medical or psychological impairment of which the law enforcement officers should be aware.  Murchison testified that two people who answered the door at the address listed on Torlai's driver's license, and who identified themselves as members of Torlai's family, told Murchison that Torlai had

---

[6] The court notes that this is not a case in which "exculpatory facts . . . became known after an arrest," which could negate the possibility of using probable cause to arrest as a complete defense to a malicious prosecution claim. D'Angelo, 288 Fed. Appx. at 726.  Although LaChance administered a breathalyzer test to Torlai immediately after taking him into custody and knew that Torlai's breath did not reflect the presence of alcohol, that test did not provide LaChance with information about whether Torlai had been operating a vehicle while under the influence of drugs, which LaChance testified he suspected because of Torlai's behavior and the constriction of his pupils.  The final results of the drug screening of Torlai's urine sample were not returned to LaChance for weeks.  Thus, at the time LaChance completed the arrest report and charges against Torlai, he did not possess information that exculpated Torlai of the charge of OUI.

not resided at that address for some time.  The court credits this testimony, and therefore concludes that a reasonable officer could also believe there were sufficient grounds to charge Torlai with failure to notify the DMV of a change in his address within 48 hours.  Thus, this charge was also supported by probable cause.

The remaining charge that could support Torlai's federal claim of malicious prosecution is interference with an officer in violation of section 53a-167a of the Connecticut General Statutes.  Although the question of whether LaChance had probable cause to charge Torlai with officer interference is a close one, the court concludes that LaChance lacked probable cause to charge Torlai with this offense under Connecticut law.

Section 53a-167a of the Connecticut General Statues provides that "[a] person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers" a law enforcement officer in the performance of her duties.  Id.  Nearly thirty years ago, "[t]o avoid the risk of constitutional infirmity," the Connecticut Supreme Court interpreted the language of section 53a-167a "to proscribe only physical conduct and fighting words that by their very utterance inflict injury or tend to incite an immediate breach of the peace."  State v. Williams, 205 Conn. 456, 473 (1987) (emphasis added).  In the ensuing years, various Connecticut courts have explored the exact contours of what constitutes "physical conduct and fighting words," but the basic proposition that only physical conduct and fighting words give rise to a viable charge of interfering with an officer has remained well-settled.  See, e.g., State v. Sabato, 152 Conn. App. 590, 595-96 (2014) (applying Williams).  Of particular note, while "a refusal to provide identifying information to a police officer in connection with a legitimate Terry stop"

15

constitutes physical conduct that rises to the level of a violation of section 53a-167a, State v. Aloi, 280 Conn. 824, 841 n.22 (2007), a person who gives false statements to the police about something other than his identity has not violated section 53a-167a, because false (non-identifying) statements to an officer do not rise to the level of "fighting words," Darbisi v. Town of Monroe, No. 3:00CV01446 (RNC), 2002 WL 32348250 at *2 (D. Conn. Jan. 11, 2002), aff'd, 53 Fed. Appx. 159 (2d Cir. 2002).

In this case, LaChance testified that he came to the conclusion that Torlai committed the crime of interfering with an officer on the basis of the totality of Torlai's actions, but that four particular facts factored heavily into his determination. First, LaChance testified that during his initial conversation with Torlai after he stopped the vehicle driven by Torlai, LaChance asked Torlai to roll down his window, which at that time was partially open,[7] and Torlai refused to do so. Second, LaChance testified that Torlai's consumption of nuts and fluid while LaChance was asking Torlai questions during the stop indicated to LaChance that Torlai might be trying to disguise the fact that he was driving under the influence of drugs or alcohol. Third, LaChance testified that, although Torlai provided his driver's license and other documents when asked to do so, he refused to tell LaChance whether the information he provided—and in particular, the address listed on his driver's license—was accurate. In fact, the address listed on the license was not accurate, and therefore Torlai provided false information to LaChance. Finally, LaChance mentioned Torlai's refusal to answer any questions posed to him,

---

[7] Torlai testified that, when LaChance approached his window after stopping his vehicle, Torlai rolled the window down three inches. LaChance testified that the window was rolled down approximately one inch. Either way, the window was open far enough that Torlai could hear and respond to LaChance's questions and pass through his motor vehicle documents when they were requested by LaChance.

both during his investigation on the side of the highway and after Torlai had been formally arrested and was being transported back to the troop.  None of these facts, either individually or in combination, could lead a reasonable law enforcement officer in Connecticut to believe that there were grounds to charge Torlai with officer interference.

As noted above, the only information Torlai could be liable under section 53a-167a for refusing to provide was his identity.  He identified himself, accurately, after he was stopped by LaChance.  Thus, neither Torlai's refusal to answer questions or his failure to disclose that the address listed on his driver's license was incorrect rose to the level of "physical conduct [or] fighting words" required for a charge of officer interference under section 53a-167a.[8]  See Williams, 205 Conn. at 473.  Similarly, Torlai's consumption of nuts and fluid, although perhaps strange, is not the kind of physical conduct that Connecticut courts have typically found to be impermissible interference with an officer performing her duties.  This is particularly true because there is no evidence that LaChance had instructed Torlai not to eat or drink anything.  See Acevedo v. Sklarz, 553 F. Supp. 2d 164, 168 (D. Conn. 2008) (noting that "Connecticut courts most frequently find illegal interference with a police officer where the officer makes a direct request, which the defendant refuses to comply with, and it is that refusal that hinders or impedes the course of the investigation of the defendant or the performance of the officer's duties").

---

[8] In this regard, the court is troubled by LaChance's testimony at trial that it is his understanding, on the basis of his training, that any citizen who refuses to answer questions or otherwise refuses to cooperate while LaChance is investigating a possible crime is interfering with LaChance's investigation and therefore violating section 53a-167a.  As a matter of clearly established Connecticut law, cited above, LaChance is incorrect.

Thus, all that remains to support LaChance's conclusion that he had reasonable grounds to charge Torlai with officer interference is Torlai's refusal to lower his window completely during the initial traffic stop.[9]  Whether Torlai's refusal constitutes "physical conduct" that rises to the level of officer interference is a close question, but in this court's judgment, this act alone under these circumstances is insufficient to support a charge of officer interference under Connecticut law.  Although Torlai consistently refused to answer most of LaChance's questions, when asked to do so Torlai provided documents, exited his vehicle, took a breathalyzer test, and provided a urine sample. Furthermore, Torlai testified that he only refused to roll down his window because he understood LaChance to be making a polite request, not giving an order, and because Torlai believed the window was open far enough that he and LaChance could communicate and pass documents back and forth.  Given that Torlai complied with LaChance's other orders, the court credits this testimony.  Under these circumstances, Torlai's failure to roll down his window did not rise to the level of physical conduct that "obstruct[ed], resist[ed], hinder[ed] or endanger[ed]" LaChance.[10]  C.G.S.A. § 53a-167a.

---

[9] The court notes that, although Torlai also declined to perform a field sobriety test, he testified that he was not ordered to undertake such a test.  According to Torlai, he affirmatively told LaChance after he exited his vehicle that he did not want to take a field sobriety test.  The court credits this testimony and concludes that no reasonable officer could decide that Torlai's statement that he did not want to take a field sobriety test was grounds for a charge of officer interference.  See Williams, 205 Conn. at 473.  Furthermore, Torlai's failure to undertake a field sobriety test was not cited by LaChance as one of the reasons he believed Torlai had committed the crime of interfering with an officer.  At trial, LaChance stated that his reasons for believing Torlai had interfered with an officer were the facts discussed in the main text above, and in particular, Torlai's refusal to roll down his window and his failure to notify LaChance that the address on Torlai's driver's license was incorrect.

[10] The court also notes that LaChance himself does not appear to have immediately believed that Torlai's refusal to roll down his window amounted to officer interference.  LaChance initially arrested Torlai for operating a motor vehicle while under the influence of drugs or alcohol and for failure to maintain his lane.  The other three charges against Torlai, including the officer interference charge, were added later, after Torlai had been transported to the troop and after Murchison had concluded his investigatory visit to the address listed on Torlai's driver's license.

Because no reasonable law enforcement officer could think that Torlai's behavior under these circumstances created grounds to charge Torlai with interfering with an officer in violation of section 53a-167a of the Connecticut General Statutes, LaChance lacked probable cause to charge Torlai with this crime.  Therefore, Torlai has met his burden of establishing the third element of a malicious prosecution claim under Connecticut law.

b.    Malice

The final element of a malicious prosecution claim in Connecticut is that "the defendant acted with malice," which means "primarily for a purpose other than that of bringing an offender to justice."  Brooks, 299 Conn. at 211.  In cases where a defendant lacks probable cause to prosecute a plaintiff, the malice element may be inferred.  See Falls Church Group, Ltd., 281 Conn. at 94.  However, lack of probable cause does not definitively establish that a defendant acted with malice.  See Giannamore v. Shevchuck, 108 Conn. App. 303, 319 (2008) (noting that, "[i]f the evidence supports a finding of a lack of probable cause, then the fact finder reasonably may conclude that the defendant acted with malice"); cf. Lowth v. Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996) (stating that under New York malicious prosecution law, "the lack of probable cause—while not dispositive—tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred" (internal quotations and citation omitted)).

The court concludes that Torlai has failed to meet his burden of proving the malice element of malicious prosecution under Connecticut law.  LaChance's testimony at trial was that he filed the officer interference charge against Torlai because he believed Torlai had committed the crime of interfering with an officer under Connecticut law.  As noted earlier, the court found LaChance to be a highly credible witness whose

19

general demeanor and testimony at trial were corroborated by the tone and content of the statements he made in the recorded phone call he placed during the traffic stop, as well as by the testimony of other witnesses.  In contrast, Torlai presented virtually no evidence from which the court could conclude that LaChance filed the officer interference charge "primarily for a purpose other than that of bringing an offender to justice."  Brooks, 299 Conn. at 211.  Because the court credits LaChance's testimony that he filed the charge against Torlai because he genuinely believed Torlai had committed the crime of officer interference and finds no facts that would tend to contradict this testimony, and because the question of whether Torlai's conduct rose to the level of criminal interference with an officer is a close one, the court declines to infer that LaChance was motivated by malice simply because he lacked probable cause to charge Torlai with interfering with an officer in violation of section 53a-167a of the Connecticut General Statutes.  Thus, Torlai has failed to meet his burden of proving the malice element of his claim for malicious prosecution on the charge of officer interference.

In sum, the court concludes that Torlai has failed to establish either that LaChance lacked probable cause or that LaChance acted maliciously when he filed the charges against Torlai.  As a result, Torlai's malicious prosecution claim fails.

## IV.   CONCLUSION

Based on the foregoing, the court orders that Judgment be entered in favor of LaChance on all claims.

**SO ORDERED.**

Dated at New Haven, Connecticut, this 15th day of December 2015.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge